We'll hear argument next in Case No. 15-415, Encino Motorcars v. Navarro. Mr. Clement. Mr. Chief Justice, and may it please the Court, service advisors are salespeople principally engaged in the servicing of automobiles. I do not think there is any realistic dispute here that service advisors are, in fact, salespeople. And it seems clear to me that service advisors, as their name suggests, are principally engaged in the servicing of automobiles. Thus, under the plain and literal terms of the statutory overtime exemption, these individuals are exempt because the statute exempts any salesperson, mechanic, or partsman who are primarily engaged in selling or servicing an automobile, a truck, or a farm implement. Now, my friends on the other side will essentially concede that those last three statutory nouns, automobiles, trucks, and farm implements, apply to every other noun-verb combination in the statute. So they don't take the position, for example, that trucks and farm implements only go with servicing and automobiles only goes with selling. But they do take the position that with respect to the gerunds, selling, that it goes uniquely with salesmen, and therefore, even if you accept for a minute that there is a class of people who exist who are salesmen primarily engaged in the servicing of automobiles, my friends would say they're not covered by the statute. Now, I would submit that the statute has multiple textual indicators of breadth that suggest that's not the right way to interpret the statute. There are not just the two. Ginsburg. May I ask you, what is the significance of the position you're taking? Does it have any real consequences, given the separate exemption for people who are working on commission? It does have real-world consequences, Justice Ginsburg, principally for those service advisors who right now are not compensated on a commission basis. And what, in this field, what percentage of service advisors are not commissioned rather than salaried employees? Justice Ginsburg, I don't have a specific statistical breakdown, but I'm reliably informed that it's a significant number. So it's not that almost everybody is on a commissions basis and there's a couple of outliers who are primarily salaried. I do think the arch-typical service advisor is paid on a commission basis, and therefore, what I take to be the import of your question, might also qualify under the 207i exemption that's generally applicable across industries to commissioned individuals. But there are significant numbers of individuals who are primarily compensated for salary, and they like it that way. And of course, as I think the Court is aware, these Fair Labor Standard Act rules are not waivable. So if you have a service advisor who's been paid primarily by salary and likes the stability that comes with that, they've had that understanding. Sotomayor, what's that? Sotomayor, if they want a job, it's a job, and unless the law protected them, no employer would pay overtime. Well, I understand that, Justice Sotomayor. I don't know how I can take from the fact that service advisors accept what's given to them because they have no choice, why they prefer not to have overtime. I don't know that I was making that strong claim. I was just trying to be responsive that this case does have real world implications, notwithstanding the 7i exemption. So what example, what — if we're only talking about those of the people who sell service, who are not on commission, what basis is there for giving them an exception? Do they work regular hours? I take it if they work regular hours and if they aren't paid on commission, why wouldn't they be treated like secretaries or others? I mean, apparently Congress thought that the mechanics themselves were special because they go out into agricultural areas or something in the middle of the night and fix a tractor. So they work irregular hours. But these people don't work irregular hours. And they're not paid on commission. So why wouldn't they be treated like a secretary or a — you've got my question. I get your question. I think I would try to rephrase it slightly by saying, though, why should they be treated differently from partsmen or mechanics if they're also paid on a more salary basis and so they don't qualify for the — Well, the answer would be because the partsmen and mechanics, so Congress thought, in agricultural areas would have to go at 3 in the morning to fix the tractor. And that's why they get within this special treatment. And whether that's still true or not, I don't know. But that's why they're there in the statute. And that isn't true of the service salesman. Here, Justice Breyer — Now, what about that? No, I do want to be very responsive to that, because I do think whatever, you know, Senator Bayh was thinking about farm implements back in the day — Right. I think today there's a very good reason to treat the service advisors the same way as the partsmen and mechanics for purposes of the overtime exception. So the first thing to focus on here is that we are talking about an exemption under the FLSA only to the overtime provisions. So however you decide this case, minimum wage provisions are going to apply. Now, here's the reason that all the people on the service team, the partsmen, the mechanic, and the service advisors really need this exemption, because most customers of automobile dealerships who need service themselves work pretty regular hours, sort of 9 to 5, Monday through Friday. So the busy times at a dealership are what they call the morning rush and the afternoon discharge part of the day, and then also on Saturday. Over 90 percent of automobile dealership service departments are open on Saturdays. So with respect to the partsmen and with respect to the mechanics, they end up working a little more than 40 hours a week, because they're there a little bit earlier than most people, they leave a little bit later, and then they're there on Saturday. Now, most of them, in fact, are paid at least partially on commission. And the way most of this works is that everybody, the partsmen, the mechanics, and the sales advisors, all kind of share in the commission. So if they bring in a certain amount of sales, they all share on that. So as a practical matter, it makes an awful lot of sense to exempt all of these people from the overtime rules. They're all paid well. They're all paid above the minimum wage, which is the exemption doesn't apply to anyways. And they all have a reason to work like about 50, 46 hours a week instead of 40 hours a week, and it would be very, very disruptive to all of a sudden take the service advisors, who are an integral part of the team, and also happen to be the best paid on average of the three, and say we're going to pluck you out, and you alone are not going to be exempt from the overtime rules. I think that would be very disruptive, and the industry has understandably come upon these arrangements during the three-plus decades when my friends at the Labor Department acquiesced to this arrangement because they had an interpretive regulation, they went out and brought some enforcement actions, and even though it was the Wage and Hour Division themselves that were litigating these cases, they could not convince a single Federal judge that they were right about their interpretation of the statute. Now, I think those Federal judges — Sotomayor, Mr. Clement, those courts were before Chevron. Oh, they were, Justice Sotomayor. And so, you know, I take less value in what the Court said, because every one of them said the provision was ambiguous. They just thought that the better argument, this was before Chevron, favored your interpretation. So I'm not quite sure that it's accurate to point to those older cases as supporting your position unequivocally. So, Justice Sotomayor, I think it's fair to take the older cases with one grain of And the reason is that Chevron, with all due respect, didn't invent deference to agencies. And that's why I think it's important to recognize that all those early cases, those were cases that were enforcement actions brought by the Wage and Hour Division. And they weren't just cases where a private party was coming in. So I don't think the judges in that case, those cases, when they were sitting there listening to the Wage and Hour Division lawyers, didn't have some deference in mind. Sotomayor, I have a very practical question. Are these sales advisors specially trained in some way? Do they go to mechanics school? Do they — how are they trained? I'm — so I'm going a little bit out of the record here, and I haven't read anything that's directly on point. My strong suspicion, though, is that there are these kind of academies that are put together, including by the National Automobile Dealers Association, and they would get some training that included both sales training, but also some training and some diagnostic. But I'm — I want to be candid that that's the case. Sotomayor, to be candid with you, it scared me to think that every time I take my car to a dealer that a non-mechanic is telling me what's wrong with it. Well, and I understand that, but I think that's actually why these people may be non-mechanics, but they're not outside the servicing lane. And there are costs for the — you know, for the dealers. This is something that, you know, I am more familiar with. There are real costs to the dealership if the original diagnostic is wrong and they end up ordering the wrong part. All of that is stuff that they do try to minimize. And I do think, to get back to the Chevron point, though, it's also worth recognizing that two of the cases that have rejected the Labor Department's position were post-Chevron cases, both the Fourth Circuit decision and Walden. But now the Labor Department had a chance to rethink. Originally, they said that these people, these salespeople, are not exempt. And then there were these, the letter, the opinion letter and the handbook. And then in, was it 2011 or 2012? They said, well, now we're going to rethink this, and our decision is that we will write the first time that these people are not exempt. And that decision is made in a Chevron era, when we defer to the expert, and this Department of Labor is certainly expert in this area. Well, Justice Ginsburg, I don't think what the agency did in 2011 merits Chevron deference. And the Labor Department, of course, asked for deference, but they're studiously vague about what they'd like you to defer to. And if you look at what they did in 2011, I don't think there's anything you can really defer to there. Because up until 2011, the interpretive regs that date back to 1970 had a specific provision, C-4, that addressed service advisers. And it explained the rationale why service advisers weren't exempt. I don't think it was particularly persuasive to any of the courts, but at least there was something that addressed service advisers specifically. Now, in 2011, in the process of this notice and comment rulemaking, they actually removed that entirely. So the interpretive regs no longer have anything that addresses the service advisers specifically. So they're now relying only on the language in C-1 that addresses salesman and says salesman is somebody who sells a car, which we think is an incomplete recognition of what the statute actually says. But what I'm making is really two points. I don't think they're really entitled to, in 2011 take something out of the regs and then all of a sudden say, well, because we took them out of the regs through notice and comment rulemaking, we now get Chevron deference where previously we might not have. I guess I don't understand it. I mean, it's sort of the classic case for Chevron deference in notice and comment rulemaking. They clearly considered exactly this question. They made a judgment on it. They have effected that judgment within a notice and comment setting. I mean, if that's not Chevron, what is? Clements. Well, two things, Your Honor, and then I want to remind you that if the statute is clear, you don't get to Chevron. But two things on Chevron. Here's the first, which is, I would agree with you if what they did is at the end of the notice and comment rulemaking, they came up with, say, a new definition of servicing, and that informed why they came up with the decision that they did. But that's not what they did. They came up with a decision that took out the provision that specifically addressed service advisors, and then a single paragraph of the preamble to the notice to the rules, because there's nothing in the rules that really addresses it anymore. So the only thing you can look to is the preamble. It's on pages C-5 and C-6 of the appendix to the red brief. There's one paragraph there that is the sum total of their explanation. I think it's worth a read, Your Honor, because what it principally says is, we're doing this because we don't think the statute covers it, which is not really the kind of explanation that I think ought to get them something other than what the statute means. And then, this is my second point. Kagan Yeah, because the first one is not so good. The first, I mean, agencies do this all the time. They say this is the way we read the statute, this is the way we want to read the statute, and this Court has never been in the business of saying, oh, when you think that the statute says something, you don't get deference, whereas when you think that the statute is ambiguous, but you give other reasons, you do get deference. I mean, that would be a completely unadministrable line to use. Clement I don't want to quibble too long with you on that. I don't think that it would be unadministrable at all. This Court has recognized the exact same principle in the Auer context, which is to say that if all you do is parrot the statute, then that doesn't really gain you any extra deference. And I think if all you do is parrot the statute, this is saying we read the statute in a certain way which we think is better than another way. And so I want to get to my second one. I would just say, though, I do think it's worth reading that paragraph on C-5 and C-6, because particularly in the unique circumstance, and this is the segue to my second point, at least in the unique circumstance where every court that has looked at the statute since you first took the position that it meant X has said, no, it means not X, to then just because you've had a rule, a notice and comment rulemaking, which, by the way, started with the proposal to codify the rule that all the courts had adopted, just because in that process you say, well, we still think we have the better view. I don't think that's enough to get you deference. But even if you disagree with me so far, I mean, I do think Fox and State Farm before it say that when an agency is changing its position, it has to account for the reliance interests that have been engendered. And you'll see nothing in that paragraph about the fact that, well, for 33 years, we, the Labor Department, agreed that this was clear the other way. I mean, the question is on the reliance interests, if you think people have been relying and will be punished for that reliance, and I guess the question to you is, well, why would that be so? Because this rule applies not retroactively but only prospectively, and there is a particular provision in the Portal to Portal Act which essentially says, if you relied on an old interpretation, don't worry, you won't be subject to any damages with respect to that interpretation. So two points on that, Your Honor. The first is that, just to be clear, the complaint in this case was filed in September 2012. It didn't say, and we hereby seek damages only after the May 2011 effective date of the regulation. So in terms of what we're facing with here, I mean, you'd at least have to trim it back based on the Portal to Portal Act provision. But here's the reason I think even that's nonresponsive to what the dynamic here is, and it's a pretty unique dynamic, I'll grant you, with this acquiescent in these circuit cases. I mean, my clients are in the Ninth Circuit, but I think this is even clearer. Think about a dealership in the Fourth and the Fifth Circuit, okay? They already have circuit precedent that says that the service advisors are exempt. Now, if all the agency does in a rulemaking is says, gosh darn it, we still think we have the better view, what are they supposed to do? Are they really supposed to change their operations overnight and conform to this, even though they have an extant circuit precedent that says they're right and the Labor Department's wrong? And that is what, at least in this narrow circumstance, makes this different. I mean, if they'd come in and say, boy, we are going to come up with a whole new C-4 and we are going to have a new explanation for why these guys are exempt, then maybe the auto dealers in the Fourth and Fifth Circuit would think, well, this is a whole new day, maybe we'd better change our practices. But I would have a hard time advising a client in the Fourth or Fifth Circuit that you ought to change your practices, notwithstanding that Walton is still on the books, notwithstanding that the Fifth Circuit decision is still on the books. Kagan. Well, I suspect, Mr. Clement, you would say to your clients, you know, you're taking a risk, because now the agency has changed their minds. And so going forward, don't worry, you're off the hook with respect to everything you've done in the past, but going forward, given this doctrine called Chevron deference, the agency is going to get a thumb on the scales, and it's very possible that you're going to, you know, be subject to damages if you keep doing what you're doing. Clement. Well, Justice Kagan, I try to be a careful lawyer, so I probably would tell my clients there is now some additional risk than there was before. But, boy, if you have a lot of workers who really like the fact that they are compensated mostly by salary and their service advisors, I'm not sure I'd go through all of the and putting them on a commission basis so we can get on to 7i and get the benefit of that exemption, just because the Labor Department has told us that after 33 years of acquiescence, that when they had an NPR that told us they were going to codify their acquiescence, that they changed their mind on no better analysis than to simply say, you know, we like our position back from 1970. I would probably tell them, if you want to be really, really careful, you should change your policy, but I like our chances in the courts. And I would tell them as well, don't worry too much about Chevron, because I really don't think the statute is ambiguous at all. I think the literal reading of the statute makes it crystal clear that if you are a salesman primarily engaged in servicing automobiles, you come within the plain terms of the statute. Or means or in that context, and even if in the course of advising them, I would have come across the Redendo canon, last used by this Court in 1918, I would have said, well, don't worry about that either, because what the Redendo canon, all it does is it says that when you are reading a statute and it has a bunch of nouns separated by or and a bunch of verbs separated by or, and you apply them all as you should, if you get to something that just is a barking cat, there is just no such thing, then all the Redendo canon says is don't lose a lot of sleep over it, just go on to the next noun-verb combination and continue to interpret the statute. Don't, like, completely reorder the way you are thinking about the statute and say, well, now, because I came across a barking cat, I have to put the first noun with the first verb and the second noun with the second verb, and, well, if I have two three nouns and two verbs, I don't know what I do. Throw up my pen. Ginsburg. And I did deflect you from the grammar for a moment just on a fact question. You said they are like the parts and the partsmen and the mechanics, and they all work a little more than the 40-hour week you mentioned, 46. But there was something in the submissions here that said the service advisors are working a 6 a.m. to 7 p.m. shift, and so it would come on average to 15 hours more. Is that incorrect? Well, I think what I recall from the complaint is that it was 7 to 6, and so that would still get you, if you don't rotate them around, that might get you a 55-hour workday. What I was going on, the 46 hours, is I think that's in the National Automobile Dealers Association amicus brief as the average kind of system-wide. Sotomayor. In 1966, were there service advisors in existence? Yes, there were. And were they paid the same way as now? Were they salaried or commissioned? I think there was a mix back then as there is now. I went to the Dictionary of Occupations, which was in existence in 1966, and it appears to have different entries for salesmen, service advisors, partsmen, mechanic. And I said, okay, do I read something from the fact that — or should I read something or why can't I read something — from the fact that Congress knew that these different positions existed, they were defined in the Dictionary of Occupations differently, and it decided to use only salesmen, which under the dictionary meant a salesperson of cars, a partsman, which was defined the way one would think, and a mechanic. But it didn't include sales advisors. Well, here's what I would say that you should read into that, Justice Sotomayor, which is you should read into the fact that Congress used the term any, and any salesman, and then modified it not just by selling vehicles, but also by servicing vehicles, to think that Congress didn't need to separately add the service advisors in because they were already covered by the language of the statute. I would also say— Sotomayor, they thought it important. The partsmen could arguably service automobiles because they provide the parts for the automobile, yet Congress found the need to be explicit and to add partsmen. Why wouldn't it have, if it's intended to include service advisors as opposed to mechanics and partsmen, why didn't it use that occupational term? It's a term of art. Well, Justice Sotomayor, I don't think if they had omitted the partsmen, I think it would be an awfully hard argument to say that the partsmen are mechanics. I mean, you could make it, and, you know, I'm not so sure I wouldn't try, but I think it would be a much harder argument than to say that the service advisors are covered by the term salesman. Sotomayor, the dictionary doesn't use the word the functions as functions of selling a car, and it doesn't use the word service in its traditional sense. It says it's going to evaluate cars. It's going to give the work to mechanics, but it doesn't use the word servicing a car. Which doesn't? The occupation? The occupational. Yeah. Well, I mean, I guess I would still say, though, the question — I'd make two points. One I've already made, which is I do think since they used any salesman, I think they thought that they already had it covered. The second thing I would say is I think if they were going to include service advisors into the statute, I think what the statute would say is exactly what it says now, which is it would say any salesman, service advisor, partsman or mechanic primarily engaged in selling or servicing automobiles, trucks or farm implements. And what I think that shows is that there's nothing at all unnatural to say that the service advisors are primarily engaged in servicing automobiles. That is what they do. They're part of the servicing process. The way I would think about this is if you imagine a very small automobile dealership and they have one person in the service department. That person is going to come out, they're going to greet the customer, they're going to work with the customer to diagnose what the problem is. Once they figure out what the problem is, they'll give them an estimate. Then if they have to fix a part, they'll go in the back, they'll grab the part, then they'll take the part and then they'll put it in the car and they'll fix the part and then they'll go back and talk to the customer and tell them what they did. Now, in a modern automobile dealership, all of that is done by three different people working as a team. And it seems to me quite clear that the service advisors are part of that servicing process. Indeed, my friends on the other side I think almost give us that, which is to say they seem to come close to saying that if the statute said salesmen primarily engaged in the servicing process, they would grant us that the sales advisors are covered. I mean, they can quibble if they want, but that's the way I read their position. They simply say, but the statute doesn't say process. And so what they have in mind is the statute must mean something very narrow by servicing. This is that you have to be under the hood or grease under your nails or something like that. And the big problem with that is the partsmen. The partsmen are no more in the main, under the hood or getting their nails dirty by actually servicing the automobile, but they are an integral part of the servicing process. And because they are covered, I think we know that Congress used the term servicing in a more capacious sense and not in some narrow sense that you have to do the servicing personally. If I could reserve the balance of my time. Roberts. Thank you, counsel. Mr. Bivins. Mr. Chief Justice, and may it please the Court. The FLSA exempts salesmen who sell cars and partsmen and mechanics who service cars. Service advisors don't sell cars, nor do they service cars, which requires automotive manual labor. They merely write up paperwork. Petitioner's argument fails for three reasons. First, selling services is not the same thing as servicing. Petitioner's argument is an end run around the statute's three direct objects of selling, cars, trucks, and farm implements. Selling services is not listed. Second. Alito, could you speak up where Mr. Clement left off? What would be the – what is the basis for covering partsmen? Yes, Your Honor. Several. The first one is, unlike service advisors, they are expressly named in the statute. Secondly, they are working as mechanics, right-hand men or women. Some partsmen grind down parts or build them up. Some use calipers and measure how they fit on cars. Some of them remanufacture parts. They use brake drum lathes and engine head grinders and valve refacers. Even those who are not are involved with mechanics in requisitioning and dispensing parts. As to those who are not, as to those who obtain parts, don't change the parts, supply the correct part to the mechanic, they would still be engaged in servicing automobiles, you would say. If they are physically dispensing the parts, handing them over, and doing so in sync with the mechanic's work. So take a transmission job. If an automatic transmission is being redone, the partsman has to know that the mechanic first needs to build the clutch units. So he first dispenses the clutch discs and plates and the clutch drum bushings. The mechanic is working on them. The partsman goes back, gets the remainder of the automatic transmission assembly, and goes and hands them to the mechanic. This is a back and forth. It's a mechanic-facing role, not a customer-facing role. Alito, they are more closely connected with the actual repairs of the car. There's no question about that. But they are not engaged in manual labor. That type of partsman is not engaged in actually doing anything physically with the car. So if they are covered, if that's — if servicing automobiles includes that, then you have to explain why the line is drawn between that activity and the activity of the employees who are at issue here. I have a couple of responses. The first one is, if there's a line to be drawn, that, of course, is for the agency. Secondly, I would say that they are engaged in the dictionary definition, repairing or maintaining automobiles. And in the reply brief at page 11, Petitioner comes very close to conceding, well, they are not repairing in the way that repairing — servicing is used in several other statutes that we cite. But our theory is they are part of this general process or integral on core sales and service, which they are adding to the statute. The only way that Petitioner manages to add that to the statute is saying that the phrase engaged in somehow broadens the ordinary meaning of servicing. But it doesn't, for three reasons. The dictionary definitions cited by the government, engaged in means employed in or taking part. So then Petitioner falls back and says, well, the FLSA, when it uses engaged in, means something broader. They cite a definition provision, 203J, in the reply brief, and they say that the definition means that engaged in includes any closely related process. So we pulled the actual subsection, which says precisely the opposite of that. It does not provide separate definitions of produced and engaged in producing, as Petitioner's quotation suggests. It defines produced equal to engaged in the production of goods. The subject is engaged in doing the action. Now, what that section says that actually broadens it is language Petitioner doesn't quote. It says an employee shall. Roberts, can you tell us where you are reading from, if it's available to us? Okay. This is in 29 U.S.C. 203J, the Petitioner's reply brief at page 11. Thank you. But the section, they don't quote the section in full. If you look at 29 U.S.C. 203J, it says an employee shall be deemed to have engaged been engaged in production if employed in a related process. It is the deeming that sweeps in closely related processes. It's not the language of engaged. And then we look at this Court's case law interpreting that very provision. So this Court has interpreted that provision as contrasting the narrower phrase actually engaged in production with the broader phrase every process or occupation affecting production. That's this Court's case, Farmer's Reservoir, 337 U.S. at 759 to 60. So far from proving that engaged in opens the door to the ill-defined process of servicing. Section 203J and this Court's precedent confirm that it does not broaden the verb servicing. And servicing means repairs, maintenance, and similar automotive manual labor. Now, is it just that I suspect it differs from place to place in how many people they have and all that, but why isn't? I mean, are these the people when you go in and, you know, you go and say the car is making a funny noise or something, do they go out and look at the car, listen to the noise? What's it — I mean, that seems to me to be more like a process, and then they go to the mechanic and say, well, you need to do this or you want to look at this or whatever. So my understanding is that the important difference between service advisors and partsmen, to answer both questions together, the service advisor is a customer-facing role. He's advising the customer, not advising the mechanic. Goes up to the customer, has a clipboard, records whatever symptoms the customer says. It's making a squealing noise or it's not driving well.  well. Now, only in that sense is he recording something with the automobile. It's not going under the hood. He's not taking parts apart. He's not rendering a final diagnosis on which the work will be based. He relays that information back. It's the mechanic who hooks the car up to the computer. Kennedy, you're saying? Kennedy, you've missed a part, and some of us up here are experts in having to go to auto agencies and coming back. Verrilli, The first thing he does is give you an estimate. Verrilli, Yes. Verrilli, both in cost and in time, and make recommendations for, well, maybe you should replace it and it would cost you X dollars. So just to say that he puts something and then it's up to the mechanic, that's incorrect. You are correct, Your Honor. He's giving a preliminary estimate based on, we think the squealing noise means you need a new timing belt, that's how much it would cost, have you had your brakes done, et cetera. But it goes back to the mechanic, and the mechanic may come back and say, no, actually you need an overhaul or something else. After going under the hood. Roberts, I don't mean to be too particular, but if there's a squealing sound and it might be the fan belt, you're saying he's not going to open the hood and look at the fan belt? Verrilli, Well, he's not going to be measuring the tension on the fan belt, touching the fan belt, doing any of that. That's back in the shop bay. For liability reasons, they can't do the work in the front. The insurance requires all of that be done in the back, is my understanding. Ginsburg, So how would you describe what this employee is engaged in? You say he's not engaged in selling cars and he's not engaged in servicing cars. So what is it? What other category is there other than selling and servicing? Verrilli, There are people in an auto dealership who do lots of things that might be part of a general process. Petitioner leaves the impression that there are three or four kinds of employees and you're just carving one out from an otherwise exempt unit. There are at least 20 categories of employees in the service department, as the machinist's brief explains. There are dozens of kinds of employees in the sales department, in parts, in used cars, in leasing. And so they may be engaged in this selling of services, but even if they are, selling services is not the same as servicing. Breyer, It isn't. Suppose you say, you phone him up and you say, I'd like the servicing department, please. Someone answers the phone, hello, who are you? I'm a service, what do you call this person? Verrilli, A service advisor. Breyer, Yeah, a service advisor. Are you engaged in servicing? Well, why would I be here if I was engaged in servicing? I'd be over in the selling department. I think you can read this either way, frankly. I mean, I don't really, I can't get too far with language, which is why I have a question which isn't related to language. I would say, if you don't think it's clear, of course, Chevron deference. Breyer, Yeah, well, that's the question. And I don't hold you responsible for knowing every word I've written in every case. But still, I did, in Fox, make a point of an administrative rule that I think is important, an administrative law rule, that when an agency changes its mind, it should explain it. And I probably, in Fox, thought that more than many of my colleagues. All right. Given my position there, and here we have the agency going along and issuing a manual where they say the opposite of what you're saying now. And then we see what happened when, after 30 years, they changed their mind. And I thought Mr. Clement was right. And if you read their reason, their reason happens to be this. The Fourth Circuit says the opposite. But we think not. Now, I know they didn't use those words, but I wouldn't call that or the equivalent a reason. And so is there somewhere in this document, C-1 through C-1, is there somewhere a reason why they changed their mind other than, oh, we think this is a better interpretation? Because that doesn't address the problem that I thought was at issue in Fox. And if I were to use one word to describe that problem, it is the word they've used. It's called reliance. I'm not saying it predominates, but doesn't the agency at least have to address it? Your Honor, there are about four questions in there, if I might take them in turn. You asked about your own writing and your own position on reliance. I'd point to your own opinion in Long Island Care, where, first of all, you took the position that intermediate agency enforcement changes, et cetera, rules, and it's, smiley, the Court said the same thing, don't count as changes of position in the first place. Breyer, that's a good point, and I don't know how absolute we ought to be there and the reason this is now facing me with that problem. Of course, they can't do everything for every employee in the agency and they get all kinds of informal advice. It's a practical problem. But here we have a kind of extreme, 30 years, manuals, noting explicitly that it's a change of position. I mean, it's not just one part of the agency can't always be consistent with every other part. So that's exactly what you put your finger on that I asked the question. And the fact that I said it that way that time, at most, is going to show I'm not always perfectly consistent, which is, I'll admit. I think Your Honor was also correct in saying in Long Island Care that the notice and comment rulemaking process makes any potential for any unfair surprise unlikely. It's also quite noteworthy in the reliance area that, as the Professor's brief pointed out, in the several days after the April 2011 rule was promulgated, even before its effective date, counsel below for Petitioners and a number of other law firms and Petitioners amicus nata were all publicizing to the members this new rulemaking process. And that's not just the paragraph at page 6, C5 to C6 of our brief, but the two pages before that, from C3 to C5, have the comments. There were seven comments that addressed this issue, five of them favored the position that the agency held in the brief. Sotomayor, did you give me the pages of the senior brief? The back of the red brief, at pages C3 to C6, is the reasoning.  The agency says, and as commentators point out, so it's incorporating by reference the two pages of comments discussion that preceded it. And on the previous pages, such as page C4, several of the amici, sorry, not the commenters, point out there are line-drawing problems here, these are not classic mechanics or servicers, they're just coordinating, they have this administrative function. They're not just because they're integrated doesn't make them, in fact, selling or servicing. Why did they change? It will be as commentators point out, then they go on to say what it is in that sentence that the commentators point out. So I agree, other people agreed with them. Sure, that's true, but the question is why the change? And I do get this. We changed it because we think that we're more consistent than the statute, than we used to think that was consistent with the statute. I'll go that far, and now I have to figure out, is that a good enough reason? We didn't think it then, but we think it now. And that's, is there anything else? There's more, Your Honor. On page C5, Neela points out some line-drawing problems. The 1978 opinion letter had some, it had drawn a line between warranty work versus non-warranty work, because presumably the warranty work was sold previously and you're not selling it now, and there are administrative problems with drawing these kinds of lines. It's cleaner and simpler for the agency to revisit the issue for the first time with notice and comment rulemaking to say, let's just treat these people as a class and not require bookkeeping of what's warranty versus non-warranty work. And so when Neela makes the line-drawing reference in there, I think that's what it's referring to, and the agency is saying, just as a class, they are not selling vehicles, they are not servicing vehicles, they are selling the servicing of vehicles. If I might. Kagan. Our complaint was filed in September 2012. The 2-year limitations period goes back to September 2010. We have noted that as for anything before the effective date of this new regulation, May 5th, 2011, the Portal to Portal Act could be pled and it could perhaps be proven that's an issue for remand. It's not in this case at this stage, but Congress has dealt with this issue. And there is nothing retroactive about applying a 2011 regulation. Kennedy, is that the good faith reliance provision? Yes, that's 29 U.S.C. 259. And is that applicable, is that an open issue on remand? That's an issue, if it hasn't been pled, it's an open issue on remand. And is that both as to pre-2011 and post-2011 damages? It's not as to post-May 5th, 2011, because the opinion letter has no force past the effective date of the new regulation. I'm sorry, you were about to say there's nothing retroactive about? About applying a 2011 regulation to post-2011 conduct. The government's brief deals with this well, that the kinds of serious reliance interests that count for these purposes are criminal penalties or civil penalties on actions that were already done before the regulation. What about the damages you're seeking before 2011? The Portal to Portal Act may well be a defense in that situation if they can plead and prove reliance. May I interrupt? You are seeking damages. We have a damages claim, but they have a defense. Well, but even though the regulation took the regulation that changed the interpretation, that took effect 2011? The notice and comment regulation took effect May 5th, 2011. And that changed the department understanding of the statute? It maintained the formal regulation. It rescinded the enforcement materials that said they would not enforce during that period of time. So the department said, I just want to get the department said they would not enforce prior to 2011. Yes. And yet you still think they should be liable for damages? No. There's the Portal to Portal Act. Well, putting aside, that's a defense. You're saying, well, you might win on that or you might not, right? Right. But you still think they should be liable for damages when the department said they were not going to enforce the position that you're articulating? Our position is that the defense may indeed preclude that. Well, I know, but I'm asking whether they're going to enforce the view that they're liable for damages because they didn't take the opposite view. So in other words, they may not succeed in their Portal to Portal Act defense, but you nonetheless think when the department says we're not going to enforce the view that they're liable for damages because they didn't take the opposite view. We are willing to concede the pre-2011 damages. Is that just at this point or is that clear from your – has that been your position all along? It's never been pleaded or approved before. It hasn't been litigated at all. It hasn't been litigated. We're just dealing with the threshold issue of how do we categorize these people. Yes. Yes, Your Honor. And on that, do you know the – I had asked Mr. Clement, what is the universe of employees we're talking about? How many of these people would not come out under the, what is it, 701i because they commissioned employees? Well, there's a wide range of compensation methods. However, most of the range of salaries we're talking about is a broad dispersion. The bottom 10 percent of service advisors, based on the figures I've seen, make less than one and a half times the minimum wage. There are entry-level jobs at 22,000 a year. Those are the people who are going to be affected by this ruling. Those are the only ones who would not qualify for a 207i if it were restructured as commissions. And so we're not talking about the highly paid ones whom the dealerships could exempt under 207i by structuring it. We're talking about people who are just above the minimum wage, less than one and a half times above. If I might deal with a few questions this Court raised earlier. One of them, the partsman issue, I'd like to offer an analogy on partsman. Petitioner's position is as if you have a statute that speaks of someone, a doctor engaged in operating. That makes sense. If the statute said doctor or nurse engaged in operating, you'd understand You don't normally think a nurse operates, but the OR nurse is close enough. But Petitioner is saying if you exempt the OR nurse, you also have to exempt the hospital intake clerk who does paperwork, maybe even the hospital intake nurse who takes vital signs. There is no reason you have to expand beyond the operating room, the person who is right there handing the utensils and scalpels over to go all the way out to the front office. Alito, I would feel more comfortable about this if I understood the criteria that Congress applied in choosing the employees who are covered by this provision. So take the case of the salesperson who is not working on commission. Why did Congress include that employee within this category, and what is different about employees of that nature from service advisors who are not working on commission? The understanding of Congress, as discussed in our brief, was that salesmen are selling anywhere they go. Back in the 60s, they would be selling off hours. They would be going to people's homes. When they met people at church or clubs or wherever, and that mechanics and partsmen, as Justice Breyer alluded to, were going out and had to work in the field, at least in some context, and it was hard to track over time with irregular hours and off-site work. In response to a few other court problems, all of that was true in 1966. Sotomayor, I'm sorry. Justice Alito. All of that was true in 1966. That really isn't – I mean, maybe it was, if not consistent with my – what I would have imagined car salesmen are doing or partsmen are doing. May I answer? Yes. And then Justice Sotomayor has a question. Yes. If the universe of employees who meet the exemption now has shrunk so it's narrower than the original purposes, that is a reason for Congress to repeal or restrict it. It is certainly not a reason for the courts to expand it. It was more of Justice Alito's. When did automobile salesmen travel? When did mechanics and partsmen for automobile leave the job? Congress, the Senate, discussed that expressly in the 1960s. I don't know when that changed. Thank you, counsel. Mr. Yang. Mr. Chief Justice, and may it please the Court. I'd like to address three points as well as answer some additional questions. The first is I'd like to discuss the text of the statute as it was enacted in 1974. Congress enacted the statute in 1974 and separated salesmen from partsmen and mechanics in subsection or Clause B. Second, I'd like to discuss Petitioner's argument that selling services is being primarily engaged in servicing automobiles. As a textual matter, we think that's just plain wrong. And finally, I'd like to discuss really what's at issue here. Petitioner has made a lot of policy arguments about high paid commission, people who are salesmen, they're incentivized to sell. Petitioner has essentially conceded in his argument that what we're really talking about are people who aren't paid on commission. Those people are who Congress was concerned about, people who fall outside of 207i, and there's no reason to expand 213b1a to cover them. So first, when Congress enacted the statute in 1974, and this you can see this on page 2a of the government's appendix, you can see the difference of what Congress did. Prior to 1974, there was a single exemption, salesmen, partsmen, and mechanics. And that applied to several different types of vehicles. It included applying to trailers and aircraft as well as automobiles. In 1974, Congress decided to eliminate the exemption for partsmen and mechanics for trailers and aircraft. The legislative history is quite clear on this. When they did that, they created subsection B. So they preserved the exemption for salesmen. But look at subsection B. This is on top of page 3a. It says, "...any salesman primarily engaged in selling trailers, boats, or aircraft." That shows you that Congress was linked salesmen to selling, and by implication, partsmen and mechanics to servicing. Because when you look at A, the only time servicing comes in is when partsmen and mechanics are there. So I think as a textual matter, that shows you what Congress was trying to do. Second, selling is not servicing. Petitioner says that you're engaged in the selling process, or the servicing process because you're selling servicing. If you are selling plastic surgery, you're not ever thought to be engaging in plastic surgery. You're selling it. Maybe you might be seen to be part of the process of servicing, but it's not natural to say that you're engaged in servicing. And I think it's telling that Petitioner has to rely on section 203J, as my brother suggested. 203J is the definitional section. The only way Petitioner gets to the suggestion that doing things that are essential to the production is production is because the statute says, for purposes of this chapter, it shall be deemed production. And as my brother explained, Farmer's Reservoirs, and this is a quote, explains it, production in the normal sense is quite different than production in the special sense defined here. But what we're talking about is the normal sense of being engaged in servicing. That means you are actually taking part in the repairing or the providing maintenance for automobiles. Service advisors do not do that. Moreover, Petitioner's reading, if you really do expand servicing to extend to people who are engaged in the process, why wouldn't you cover salesmen who only sell warranty and warranties, salesmen who only sell the anti-rust coating under the car, salesmen at the counter that sell the key fobs and other things that are branded with the dealership's logo? They're all engaged in selling automobiles in the sense that you've got to advertise, you've got to sell. This promotes the sales of automobiles. That's wrong. The mechanic that simply fixes the HVAC system or fixes the Xerox, were they engaging in servicing automobiles? Everybody at a dealership, in the Petitioner's view, is essentially engaged in selling or servicing because they're engaged in the process of selling or servicing automobiles. That's just wrong. Long line drawing is necessary. Now, we depart a little bit from Respondents in that we think the statute is ambiguous. Right? I mean, if the statute had just said salesmen engaged in selling or servicing, you'd be forced to say, wow, Congress must have meant salesmen instead of intended distributive meaning when they included salesmen, partsmen, and mechanics. But the line drawing that has to be done here, if you acknowledge that line drawing has to be done, salesmen, the service advisors, are way down the line. They rely on partsmen, but partsmen, as we explain, are working hand in hand with mechanics. So they're logically understood to be servicing. But a salesman is not logically understood to be servicing. So what's key about the canon of Redendo and the recognition of distributive phrasing is not that you have to read the statute that way. But what it does suggest is that there is no such basic rule of grammar that requires the use of or to link every antecedent noun with all antecedent gerunds. So the question is whether it's ambiguous. So if we get into ambiguity, the agency has construed this statute in notice-and-comment rulemaking. That is entitled to deference. Now, before Mr. Yam, why was it? I mean, for the most part, this explanation seems like not the world's best explanation to me, but perfectly adequate. But Mr. Clement does have a point, that somehow the agency took out this more specific explanation. And I guess if I were just looking at the explanation itself, I would say, you know, not an A-plus job, but fine. But it is a little bit perplexing as to why they took this out. Why was that? Clement, Well, we don't have this in the record, but I've been informed that there was an inadvertent mistake in drafting. All of these are in subsection C of the statute. Kagan. Well, I really did not expect you to say that. But it was inadvertent, but it doesn't make a difference, and I'll explain why. The prior C-4, they redid C-1, 2, and 3, and they just didn't reprint 4 because it hadn't changed at all. So, but the reason it doesn't matter is what C-4 said before. Sotomayor, Not an A-plus explanation. Clement, It's a passing grade. But what I would say is in C-4 before, this is reproduced on page 6A of the appendix to our brief. It said, Sales advisors aren't included unless they're primarily engaged in the work of a salesman, partsman, or mechanic, as defined. So what really does the work is the definition of salesman. And the definition of salesman is what they reenacted after notice in common rulemaking with some modifications to take care of changes since the 1974 amendments. The definition of salesman covered, and they say, as used in section 13b-10. So they're construing the term salesman as used in this statutory provision. It means someone who's engaged in making sales or obtaining orders for the sale of vehicles. Service advisors don't fall into that category. So they're not salesmen within the meaning of the statute as it has been construed. They're salesmen, sure, in kind of a general sense, but they're not salesmen as construed in this provision because they're not engaged in selling automobiles. Not the perfect, but a passing grade for the agency. Breyer. Breyer. Now, that's – maybe this problem in my mind will go away, but I'm with you up to a large point. I think it is ambiguous. I think there is no longer any reason at all for having the mechanics exempt, but they're there. And so then with the service people, an agency could reason, well, let's not make a bad situation worse, which is what you say. Or they could reason the opposite. These are virtually identical. Why not treat them the same? I'd say that was within their power. Now, problem, 30 years. And so the real question is, don't they have to address this? I mean, do they? I mean, you know, I guess I could – I'll read that again and try to see do they really address it. But that's where I'm having a problem. And it isn't just – he's quite right, your colleague, where he says this isn't just a simple reversal of a regulation. It isn't that. They never really had the regulation acquiescing, and they've had to find things in handbooks and so forth. But the practical fact is everybody thought the law was what the Court said. And so now suddenly in the – I mean, this is a problem because, after all, different protection in the APA from preventing too big a shift too quickly, the protection being address it, address it, think about it. I think what's necessary is for the agency to recognize that it had a prior position, which it did here. It also has to explain what it's doing, which it did here. It explained how it understood the statute to be most appropriately read. Now, to the extent you also have to – you're suggesting that the agency has to explain why its prior interpretation was wrong? Breyer, I don't think either would be wrong. I mean, but they have to explain why are we, despite 30 years of going along with the other, why now do we think that was a mistake? I think you can – you can – if that were a requirement, we don't think it's necessary. But if it were, you could easily see the answer by reading the 1978 opinion letter in conjunction – if I can follow up, finish, thank you. The 1978 opinion letter was based on the theory that service advisors are selling. They're doing selling. And so as a result, they said, well, when you're working on service under warranty, you're no longer selling, so you don't count for the exemption, only when you're selling non-warranty services. Roberts. Roberts. Thank you, counsel. Mr. Clement, 4 minutes. Mr. Chief Justice, and may it please the Court, just a few points of rebuttal starting right where Justice Breyer and my friend from the SG's office left off, which is to say, I think, you know, if you look at what they did in the preamble, they did what agencies do every day, which is first they say we've got some comments that said this, we have some comments that say that. They simply relate what the comments were. Then there's the money paragraph that explains what they actually did, what justifies their decision, and there's nothing in there about reliance interests at all. So if there's anything to your fox position, then I think this does not get a passing grade. It gets a flunking grade. And what I'd like to just offer as a potential comparison, as you may know, the agency has also revisited the issue you addressed in Long Island Care, and they did that through notice and comment rulemaking. And it's worth a quick look to show what night looks like and what day looks like, because that is all about the reliance interests of the fact that they treated this one way for many, many years, and there's sections of that preamble explaining when they change it, how this is going to impose costs and why those costs are justified. It's — it is a stark example of how the agency should behave when they're changing the position. And here's the last thing to add about this. It also, if they give that kind of analysis, it gives some reason for people, especially in the Fourth and the Fifth Circuit, who already have a binding circuit precedent that say that service advisors are not — are exempt, it gives them a reason to maybe think about changing. But when they do nothing to address the reliance interests and they just say, gosh, we really think we were right all along, why is anybody, especially in the Fourth and Fifth Circuit, supposed to change the way they're doing things, and that's the only way that they say they can even possibly get within this protection against massive retroactive damage liability? So I think, in a sense, the State Farm principles or the Fox principles would work hand in hand with this concern about retroactivity. If they could do it. Sotomayor So is it okay if we just send it back? Clement Sure, as long as it means that there is no retroactive liability. I mean, it would consent to it. Sotomayor Well, they've already conceded there's not, so they're not going to claim any. Clement No, no. No, what they won't concede — what I'm talking about retroactive liability is I'm talking about liability that predates when they clearly explained why they changed their position, which would be sometime in late 2016, as opposed to in 2011. So in that sense, it does make a big difference. Just a couple of other technical points, because I do think you actually don't even need to get to any kind of deference issue. My friend on the other side, I think we have the better reading of 203J if you want to look at it, because Congress specifically, it's a definition session, everything in there is what they deem things to mean, and then they deem production to mean one thing, and then they mean engaged in production to mean something broader. But in all events, my friends concede that engaged in means taking part. Well, the service advisors take part in servicing, just like the partsmen take part in servicing. Mr. Chief Justice, if you have any questions about what the service advisors do, a good place to look is the complaint. JA40, they tell you what they are — they evaluate the service and or repair needs of the vehicle, and they write up an estimate for the repair and services. That, to me, seems to be taking part in the servicing process. I'm not so sure that's not more integral to the servicing process than what the partsmen do. The last point I'd like to make here is that there is a practical anomaly that will be created with siding with the other side, is that the best paid people in the servicing departments will now be the only ones that are not exempt. On average, the service advisors make about $66,000 a year. The average partsman makes $51,000 a year. The average mechanic makes $59,000 a year. Now, I'd have to be the person that has to go explain to the partsmen and the mechanics why it is that their better paid service advisor colleagues are the only ones that aren't exempt from the FLSA overtime provisions and are going to get a windfall in litigation like this. That would be a mistake. Ginsburg. Because they would be exempt to the extent that they paid on commission, which, as I understand it, most of them are. Yes, Justice Ginsburg, but to repeat my answer to you, there are people right now who are service advisors who are not paid principally on a commission, and they like it that way. And the consequences of ruling in the other side's favor is that automobile dealerships are going to have to go to these people because FLSA provisions are not waivable, and they're going to have to say, look, I know you like it this way, but we got this Supreme Court decision, so we're going to have to rejigger things so you get into this different 7i exemption for commission, so you can no longer be paid the way that you've been paid for the 30-plus years that the Labor Department has been acquiescing in this. We think you should join the decisions of every court to address this issue, save the Ninth Circuit below, and find that service advisors are salesmen principally involved in servicing automobiles. Thank you. Roberts. Thank you, counsel. The case is submitted.